# DECISIONS

OF THE

# Supreme Court of Florida,

## AT TERMS HELD IN 1863-'64.

TRUSTEES INTERNAL IMPROVEMENT FUND, APPELLANT, VS.
WILLIAM BAILEY, APPELLEE.

1. Under the statute of Florida, which authorizes the calling in of a Judge of the Circuit Court in cases where one or two of the Supreme Court Judges are disqualified, it is absolutely necessary the retiring Justice should be disqualified to render the Circuit Judge eligible and competent to sit. This disqualification must be a legal one, not imaginary, or of feelings of delicacy, or of inconsistency, not coupled with interest, but must be valid in law.

2. The same objection must be against a Judge as against a juror; because one is to judge of the law, the other of a fact.

3. It does not always rest with the Judge alone, whose right to sit is questioned, to say whether he is or not disqualified. In cases where there is a doubt or question, it should be referred to the decision of the Court.

4. A Judge, as well as a juror, must be immediately interested in the very issue in question, which interest must not be uncertain or speculative. A mere *speculative possibility* of such an interest is no sufficient ground for a principal challenge to a juror or Judge.

This case was decided at Tallahassee.

At a term held in January, 1862, the Supreme Court delivered an opinion in the case of The Trustees of the Internal Improvement Fund vs. William Bailey, affirming the decree of the Circuit Court. A petition for a rehearing of the case was filed at the same term of the Court by the counsel for appellants, which was refused. An Act of the Legislature, approved December 10, 1862, entitled "An Act to repeal an Act to facilitate the construction of the St. John's and Indian River Canal, approved January 1st, 1857, and for other purposes," contained the following provision:

"SEC. 8. *Be it further enacted*, That the Attorney General shall file an application before the Supreme Court for a rehearing in the case of the Trustees of the Internal Improvement Fund vs. William Bailey, before a competent tribunal, or by bill or otherwise, to be filed by him, shall come before a competent tribunal to have the questions in the above case settled, and the questions arising out of this Act in regard to the Indian River Canal."

In pursuance of the provision of this section, the Attorney General, at this term of the Court, filed his application, according to the directions of the law, as follows :

*To the Justices of the Supreme Court of the State of Florida, setting at the City of Tallahassee :*

The Attorney General of the State of Florida, Jno. B. Galbraith, shows to this Honorable Court, that at the first session of the 12th General Assembly of this State an act was passed entitled "An act to repeal an act to facilitate the construction of the St. John's and Indian River Canal, approved January 1st, 1857, and for other purposes ;" approved December 10th, 1862. That the 8th Section of said act is as follows, to wit:

"SEC. 8. *Be it further enacted*, That the Attorney General shall file an application before the Supreme Court for a rehearing in the case of the Trustees of the Internal Improvement Fund vs. William Bailey, before a competent tribunal, or by bill or otherwise, to be filed by him, shall come before a competent tribunal to have the questions in the above case settled, and the questions arising out of this act in regard to the Indian River Canal."

Therefore, in accordance with the provisions of the above cited section or law, application is made before this Supreme Court for a rehearing in the case of the Trustees of the Internal Improvement Fund vs. William Bailey before a com-

petent tribunal, and your Honorable Court is hereby petitioned to grant the same.

JNO. B. GALBRAITH,
Attorney General of Florida.

Motion was made to docket the case.

The first question to be determined by the Court was its competency to hear the application at all ; and, secondly, the power of the Legislature to direct such an application to be made, or to be heard or entertained by the Court.

The competency of the Court in regard to the matter in hand was not made a question in the original argument of the case, but is now presented as a reason why certain members of the Court cannot sit to determine the present motion. It appears that at the time when the case was decided by the Court, that one of the Justices was a stockholder in the Pensacola and Georgia Rail Road Company, though he is not at this time ; and also that he was one of the Trustees of the Internal Improvement Fund, who endorsed the bonds that Bailey holds. It also appears that the children of another of the Justices hold stock in the said Company. These are the grounds upon which the incompetency of the Court is asserted.

*Thos. Baltzell*, in behalf of the petition and motion.

The Court ruled that it was not competent for the counsel of the Trustees to appear on this occasion, yet by the invitation of the Attorney General he has been permitted to sustain the proceeding directed by the Legislature, and with perfect propriety, inasmuch as he was a member of that body and possessed of the reasons which induced its adoption.

It is admitted that one of the Judges was a stockholder, and another guardian for his children, (constituting a majority of the Court,) who are stockholders of the Pensacola

and Georgia Rail Road Company, and one of them was a Trustee of the Internal Improvement Fund, who signed the endorsement on which the suit was founded, a fact asserted in the petition for a rehearing presented to the Court before its final decision. Whether such relation made them incompetent to hear and determine the cause, is the question now presented for the consideration of the Court.

Though the opinion and the brief of counsel, in the 10th volume of Florida Reports, page 114, present the facts and arguments in the main, yet their recital here is deemed essential to a proper understanding of the case.

In the year 1841, the Congress of the United States made a donation to the State of Florida of 500,000 acres of land, on the condition that " the net proceeds thereof shall be faithfully applied to objects of Internal Improvement, to wit : roads, railways, bridges, canals, improvement of water courses and drainage of swamps."

In 1850, they made another donation " to enable the State of Arkansas and other States to construct necessary levees and drains to reclaim the swamp and overflowed lands within their limits," whereby they granted the whole of said lands, unsold at the passage of the act, provided that the proceeds of said lands, whether from sales or by direct appropriation, shall be applied exclusively, as far as may be necessary, to the purpose of reclaiming said lands by means of levees and draining."

The amount thus obtained by the State of Florida is estimated at twelve millions of acres, constituting the principal subject of the present controversy.

In the year 1851, this law was communicated by the Governor to the State Legislature, who, accepting the grant, directed " a classification of the lands, and the Treasurer to keep an account of the sales thereof distinct and separate from others," and a right of pre-emption was granted in

them. In 1853, contracts were directed to be made with persons "to reclaim swamp lands for a portion, not exceeding half."

The Constitution of the State makes it the duty of the General Assembly "to provide for the prevention of waste and damage of the public lands now possessed or that may hereafter be ceded to the State, and it may pass laws for the sale of any part or portion thereof, and in such case provide for the safety, security and appropriation of the proceeds;" also "to ascertain, by law, proper objects of improvement in relation to roads, canals and navigable streams, and to provide for a suitable application of such funds as may be appropriated to such improvements."

In the year 1855, the Assembly passed the Internal Improvement law, which, reciting the provision of the Constitution of the State above quoted, and the two acts of Congress referred to, "for the purpose of assuring a proper application of the fund for the purposes therein declared, vests the said lands and all the funds arising therefrom in five Trustees—the Governor, Comptroller, Treasurer, Attorney General and Register of State Lands, and their successors—to hold the same in trust, with power to sell and transfer said lands and receive payment for the same, and invest the surplus moneys arising therefrom in stocks of the U. S., stocks of this State, or Internal Improvement bonds issued under the provisions of this act, and to pay the interest from time to time on the bonds to be issued by the different Rail Road Companies under the provisions of this act."—Sec. 2, page 10, Acts 1855.

It is also enacted, "that for all payments made by the Trustees of the Internal Improvement fund on account of interest for any Rail Road Company, agreeably to the provisions of this act, said Trustees shall demand and receive from said Rail Road Company equal amounts of the capital

218     SUPREME COURT.

Trustees Int. Imp. Fund vs. Wm. Bailey—Argument of Counsel.

stock of said Company, which stock shall entitle the Internal Improvement fund to all the privileges and advantages of private stockholders."—Sec. 14, page 15.

The third section provides, "that all bonds issued by any Rail Road Company, under the provisions of this act, shall contain a certificate on the part of the Trustees that said bonds are issued agreeably to the provisions of this act, and that the Internal Improvement fund, for which they are Trustees, is pledged to pay the interest as it may become due on the said bonds."—Sec. 3, page 10.

Another section provided that "the Trustees shall make such arrangements for the drainage of the swamp and overflowed lands as in their judgment may be most advantageous to the Internal Improvement fund, and the settlement and cultivation of the land, &c.—Sec. 16, page 15.

In the year 1861, the Legislature passed a law by which it was enacted that "the Trustees shall contract for the clearing out and improving the channel of the Apalachicola river, and to reclaim the swamp and overflowed lands on said stream, and shall have the said work done as soon as practicable, and shall raise whatever means are necessary from the Internal Improvement fund and from the lands thereof."

This the Trustees were prevented from doing by an injunction, issued at the instance of General Bailey, the holder of $30,000 of bonds issued by the Pensacola and Georgia Rail Road Company, payable in thirty years, with interest at seven per cent, semi-annually, signed by the Trustees, in accordance with the third section of the act aforesaid, and who claimed that the entire fund should be appropriated to the payment of the bonds issued to this and other Companies, and to no other use or purpose.

The Trustees replied that the subject of drainage, the claim asserted by the City of Apalachicola, had equal rights to a portion of the fund by the 16th section of the Internal

Improvement law, by the 500,000 acre grant of Congress and the Constitution of the State, and the superior and exclusive right to the twelve millions grant by the express terms of the donation; that the exclusive right claimed for Rail Roads had no letter, line, section nor clause of any law in its favor, but was directly opposed to them all; that the State was but a Trustee to execute and carry into effect the provisions of these acts of Congress, to which her faith was pledged, and that she could not create a *new trust* to apply the land to different purposes and to other objects. They farther contested the right of these corporations to any part of this fund, under that clause of the Constitution of the State which declares "that the General Assembly shall not pledge the faith and credit of the State to raise funds in aid of any corporation whatever," insisting that funds were obtained from complainant Bailey, through this pledge of the State's lands and resources in aid of this corporation, and that consequently the engagement was void.

Other views presented by counsel were to the effect that the Trustees (even if the obligation was admitted to be valid) were but securities, guarantors or endorsers to the amount of the interest, and in no event liable, except in case of the insolvency of the principal, the Rail Road Company, which was not pretended in this case.

And, again, admitting the pledge or mortgage, the right of the Trustees, as mortgagors, to improve the property by drainage or other means has not been taken away by legislative action—this has been exercised by common consent throughout the State for years past, in case of the Union and Life and Trust Banks, and never contested by any.

The Constitution, too, provides "for an application of the funds by the General Assembly and their appropriation for improvements," and expressly enjoins, in another clause,

that "no money shall be drawn from the Treasury but in consequence of an appropriation by law."

The Judges held that "the General Assembly took a wise view of the Constitution, and therefore designated, in the beginning, only a few grand objects vital to the State for improvement, leaving others to wait for State aid until those first inaugurated should have passed successfully through the fiery ordeal of their difficult and doubtful struggle into existence. Accordingly, the General Assembly designated for State aid, in the first instance, only a line of Rail Roads from Jacksonville to Pensacola—from Fernandina to Tampa Bay, with a branch to Cedar Keys—and from Tallahassee to St. Marks—and a Canal between the Indian and St. Johns Rivers. After these roads should be built and prove a success by being able, for five successive years, to pay six per cent. on the capital stock paid in, and the interest on the bonded debt, and one per cent. yearly to a sinking fund on said debt, then the Trustees may apply, under the direction of the Legislature, the annual income arising from said fund for other purposes of Internal Improvement. This we clearly think the Legislature had a right to do."—Reports, p. 127.

They say "they will not discuss the question whether the act of 1855 is in violation of the act of Congress ceding the lands composing the Internal Improvement fund to the State. It is enough for them to know that the Trustees derive their existence from the act of 1855."—p. 128. Again: "The act of 1861 is an attempt to repeal the act of 1855, in so far as it seeks to divert the Internal Improvement fund from the purposes therein indicated, which, we have shown, cannot be done, since rights have become vested under it. All the fund having been appropriated for the present to the purposes mentioned in the act, it follows that the rights of those who have purchased bonds, on the faith of that appropriation, would be violated if any portion of the fund should be

applied to any other purposes so as to endanger their security."—p. 130.

That this is in fulfilment and execution of the trust "faithfully to apply the net proceeds of the 500,000 acre tract to roads, railways, bridges, canals, improvement of water courses and draining of swamps," or of the twelve million acre grant exclusively to the "reclaiming of swamp and overflowed lands by means of levees and draining," is no where asserted nor pretended; and yet the Trustees are required to apply these proceeds in direct derogation and disregard of the very grant under which they hold, this trust being manifest in the very instrument and act of their creation!— in disregard of the Constitution designating "roads, canals and navigable streams as the proper objects of improvement," and in disregard of the Internal Improvement law itself, that provides as well for other subjects as for Rail Roads.

As to the objection that the endorsement of the Trustees "pledged the faith and credit of the State to raise funds in aid of a corporation," the Judges say: "To our minds the difference between appropriating or pledging a fund already raised by the gift of the United States to the State of Florida and the pledging of the faith and credit of the State to raise funds not yet in existence, is too manifest to admit of much argument. It is very clear that the General Assembly could not issue what are known as faith-bonds in the banking history of this country, thereby pledging the faith and credit of the State to raise funds in aid of a corporation, but we think it equally clear that the General Assembly may convey in trust, pledge or mortgage, for the benefit of those who may aid in the construction of certain improvements, a fund already existing and possessed by the State through the cession of the United States."

3 .

. This position is the only one taken by the Trustees which the Court thought worthy of discussion. We have already seen, as to another prominent point in the case, the declaration that they "would not discuss it." Other positions, alike important and essential to the merits, were overlooked or not considered.

It is urged that the Trustees are estopped from setting up any of these defences. Text-books and books of reports establish the very opposite. "Estoppel does not apply to a grant or acting officially as a public agent or trustee."—1st Greenleaf Ev., p. 27; Coke Litt., 363; 12 T. R. 14. This is most conclusively established by the case of Newell vs. the People of New York, having a bearing on the case in other aspects.

In the year 1851, the Legislature of New York passed a law for the enlargement of the Erie and other Canals, by which the Comptroller of the State was directed to issue certificates to the amount of a million and a half of dollars, redeemable in the revenues of the Canal, but, on the face of the certificates stated to be without any other obligation, liability or pledge on the part of the State."

. These were objected to, " as being in their vital parts and provisions not only unauthorized by the Constitution, but in direct conflict with it, which provides that ' no debt shall be hereafter contracted by or in behalf of the State, unless authorized by a law imposing an annual tax to pay interest and provide for the discharge of the principal—such law to be submitted to the people before it can take effect.' "

.: In support of the certificates, it was urged " that the law was passed by a large majority of the Legislature, and ratified by one subsequently elected—that the Executive of the State and State officers had carried it into partial execution —that a number of the most distinguished and able jurists and expounders of constitutional law had examined the

question and written opinions in favor of it without the ex-
pression of a doubt, and that important rights, involving
immense sums of money, had been vested under it." Yet
the Court of Appeals of the State, composed of eight Judges
of the greatest learning and ability, after great deliberation,
with but one dissent, declared the law unconstitutional—
that no rights were vested under it, and "that if the law
were carried into effect it would impose an obligation on
the State to pay the certificates, notwithstanding the dis-
avowal of obligation, liability or pledge on its part."—3 Sel-
den, 119.

   The effort was common to the Legislature of both States,
New York and Florida—that of pledging the revenues, the
means and property of the State, without creating a debt.
Yet, with great propriety, it was declared ineffectual on the
ground that, without a debt, there was no mortgage nor
pledge—there being no incident without a principal.

   It will thus be perceived that the issues raised in the case
were of vital importance to the Pensacola and Georgia Rail
Road Company, much more so than to the party on the
record, General Bailey. That corporation being fully re-
sponsible and solvent, he was not much concerned as to the
liability of the endorsers. If the Court should decide the
endorsement of the Trustees to be invalid, and that drainage
had the exclusive right to the twelve million grant, the Rail
Roads would become liable, and the Trustees and the State
be relieved from the payment of seven per cent. interest on
$3,512,860 of bonds issued for thirty years, amounting to
$7,377,000. The Pensacola and Georgia Rail Road Com-
pany would be responsible for nearly half this amount—
$3,688,500. If the Court should decide that improvements
might be made from the fund, and that other subjects—
to wit : canals, water courses, bridges, &c.—were entitled

to participate, then there would be a reduction of the amount to be paid for them to this extent.

And, superadded to these results, upon such a decision the corporation would lose the sale of their stock to the amount of the interest paid for, say the sum of $3,688,500, as provided by the 14th section of the Charter—would be deprived of bonds to the amount of $220,000 for the extension from Tallahassee to Quincy, an application for which was being made at the time of the decision, and would lose all further bonds directed to be issued for the extension of the Road from Quincy to Pensacola. Such was the estimation in which the decision was held by this Company, that the opinion of the Court was published in their Report of 1862, with the assurance of their President "that the Supreme Court of the State had decided that a holder of bonds issued under the Internal Improvement act of 1855 may injoin the Trustees from appropriating any portion of it to other purposes than those named in the act, so as to endanger its security, even though such appropriation be commanded by a subsequent act of the General Assembly, and that there should be *no difficulty of disposing of such securities at par.*"

By the decision of the Court, as announced in 10th Florida Reports, the entire amount above stated has been saved to the Company—such being the direct, immediate, certain interest of the Pensacola and Georgia Rail Road Company in the subject of the suit of General Bailey vs. the Trustees of the Internal Improvement fund, and such the degree and amount of interest of all and each of the stockholders of that corporation.

And, now, it is most respectfully submitted whether the conclusion be not irresistible, that the members of this Court who are stockholders in that Company, in asserting their competency to determine the questions at issue, are not thus

virtually and in effect assuming to pass upon the legality of their own acts as such, and to decide upon the validity of their own bonds and obligations, contested before them by an adversary party, and, moreover, one of these members having been a Trustee of the Internal Improvement, signing the endorsement on the bond? It is further submitted whether this member is not consequently now placed in the attitude of assuming to determine the nature and extent of his authority in that official character, asserting the validity of his action in the premises and determining the legality of his official deed, in like manner contested by a party deny-ing its validity and presenting a claim in conflict with it?

If, therefore, such be the true relations of the members of the Court to the subject-matter on which the suit of General Bailey against the Trustees is founded, and such the relative connection and interest in which these members are, as it is contended, inevitably involved, then the incompetency of a majority of the Court in the decision referred to becomes so apparent and manifest as to require no farther argument in its support.

*M. D. Papy*, in behalf of the appellee, and against the motion.

FORWARD, J., delivered the opinion of the Court.

The appeal in this case was argued before this Court on the 14th and 15th days of January, A. D. 1862, and on the 31st day of said month and year this Court delivered its opin-ion affirming the decree which had been rendered in the case by the Judge of the Middle Circuit.—See 10 Florida, page 125.

Fifteen days were then granted to counsel to file petition for a rehearing, and on the 19th of April, 1862, the prayer of the petition was denied.

And now at the opening of the present term, on the 7th December, 1863, the Attorney General presents another application for a rehearing, and stated that he did so, not as the attorney of the appellants, but solely in obedience to the 8th section of an act of the General Assembly, passed since the decision of that case, to wit: on the 10th December, 1862, and entitled " An act to repeal an act to facilitate the construction of the St. John's and Indian River Canal, approved January 1st, 1857, and for other purposes," which reads as follows, viz :

" That the Attorney General shall file an application before the Supreme Court for a rehearing in the case of the Trustees of the Internal Improvement Fund vs. William Bailey, before a competent tribunal, or by bill or otherwise, to be filed by him, shall come before a competent tribunal to have the questions in the above case settled, and the questions arising out of this act in regard to the Indian River Canal."

The Attorney General, simultaneously with the presenting of the petition, and as an initiatory step to its hearing, moved to docket the case of the Trustees of the Internal Improvement Fund, appellants, vs. William Bailey, appellee, whereupon M. D. Papy, Esq., who had been Attorney and Solicitor for said William Bailey in said cause and still representing him, being present, objected to said motion on the ground that so much of said eighth section as directs the interference in a suit between said litigant in this Court, is a Legislative interference with the Judicial Department by attempting to exercise a power properly belonging to the Judiciary, violative of the vested rights of said William Bailey, and therefore unconstitutional. A question of the unconstitutionality or constitutionality of said enactment being thus presented, the Chief Justice and Associate Justice Walker severally stated that they had learned, since the said case of the Trus

tees of the Internal Improvement Fund vs. William Bailey was decided, that it was the opinion of one of. the counsel for the Trustees that they had an interest in the questions involved in said cause such as disqualified them from sitting therein, and severally made the following statement, to wit:

The Chief Justice stated that he was not, nor is not now, a stockholder in said Company; but that, in the organization of said Company, he subscribed to the amount of $3,000, taking the certificates of stock payable to his six children, in equal proportions. Five of said children were minors at the time, and four of them still under age. That the stock was paid for out of his individual funds and not out of any trust fund—that the said shares were a gift to his children.

Associate Justice Walker stated that he was a stockholder in the Pensacola and Georgia Rail Road Company at the time said cause was decided, but that since said decision he had transferred his stock to another person and was not now a stockholder; and they severally submitted for the decision of the Court whether, under this statement of facts, an order should be made calling in two Circuit Court Judges to sit on the hearing of said application.

At the request of the Court, the question of disqualification of said Judges was fully and ably discussed by the Hon. T. Baltzell and M. D. Papy, Esq.

The Court, having taken the question under advisement and duly considered the same, delivers the following opinion:

It is provided in the 5th section of the act organizing the Supreme Court of Florida, passed the 11th January, 1851, "That whenever, from any cause, any one or two Justices "of the Supreme Court are disqualified or disabled from "hearing and determining any cause brought before them, "it shall be the duty of the Justices of the said Court to no- "tify the same to any one or two Judges of the Circuit

" Court, as the case may be, and at the time and place where " such causes shall be set for hearing, and it is hereby made " the duty of said Circuit Judge or Judges, upon receiving " such notice, to attend at the time and place designated, " and he or they shall be and are hereby invested with full " authority, in conjunction with the remaining Justice or " Justices of the Supreme Court, to hear and determine the " causes of which they were notified as aforesaid."

By an act passed the 4th December, A. D. 1862, entitled " An act in relation to the qualification of Judges," it is enacted " That no Judge of any Court or Justice of the " Peace shall sit or preside in any cause to which he is a " party, or in which he is interested, or in which he would " be excluded from being a juror by reason of interest, con- " sanguinity, or affinity to either of the parties; nor shall he " entertain any motion in the cause other than to have the " same tried by a competent tribunal." 2d, " That the " Judge or Justice so incompetent shall retire of his own, " motion, and without waiting for an application to that " effect; that any and all judgments, decrees and orders, " made by a Judge or Judges so incompetent, shall be of no " force or validity, and are hereby declared to be null and " void, except an order for the trial of the cause as herein- " before provided."

It will readily be seen that to render the Circuit Court Judge eligible and competent to sit as one of the Supreme Court, it is absolutely necessary the retiring Justice of the Supreme Court should be disqualified or disabled from hear- ing and determining the cause. This disqualification must be a legal one, not an imaginary one, nor one of feelings of delicacy, nor of mocked inconsistency, but must be valid in law. Were a Circuit Court Judge to sit in a case in which the retiring Supreme Court Justice was not in law disqualified, a decision made by him would be just as much

*coram non judice* as it would be where a Supreme Court Justice sits in a cause in which he was disqualified. It is the *disqualification* of the Supreme Court Justice that authorizes the order for calling in a Circuit Court Judge.

The act of December, 1862, in relation to the qualification of Judges, is nothing more than what was the law before, and has always been so considered in this State, excepting, it may be, in so much thereof as declares judgments, decrees and orders, made by an incompetent Judge, void instead of voidable. Nor is the provision that an incompetent Judge shall retire of his own motion, &c., anything but what has been the uniform practice of this Court, in cases where the incompetency of the Judge for any cause, was clear, certain and manifest; so in cases where there has been a doubt or question as to the disqualification of one of the Justices, the question has been referred to the decision of the Court. This seems to be the practice of other States, where, like our own, no provision is made as to how and in what manner the question of disqualification is to be determined. Such is the course pursued in Tennessee, as will be seen by reference to Waterhouse vs. Martin—Peck, 374—wherein the Court say it does not rest with the Judge alone, whose right to sit is questioned. A proper administration of justice requires that no Circuit Court Judge shall sit in a case where there is no disqualification, as much as it does that no disqualified Supreme Court Judge shall act. There being no mode of determining this question, provided for by statute, we hold that the safest and legal way of determining the same is by a decision of the Court, in cases where there is any question or doubt as to the qualification of the Judge. The degrees of consanguinity, affinity, and the question as to whether a Judge has an interest or not, is one in which the purest and best legal minds may in all honesty differ. Such has been found to be the case in other States,

4

not only as to qualification of Judges, but as to competency of jurors and witnesses.

There is no doubt but that the same objection must lie against a Judge as against a juror; because one is to judge of the law, the other of a fact.—19 Johnson, 172; Pearce vs. Atwood, 13 Mass., 341.

With jurors, a principal challenge is such that where the cause assigned is such that it carries with it *prima facie* evident marks of suspicion, either of malice or favor, as that a juror is of kin to either party within the ninth degree—that he has been formerly a juror in the same cause—that he has an *interest* in the cause.—3 Blackstone's Com., 363.

Interest, in the issue to be tried, is a good and sufficient ground of challenge to a juror; so interest, in the question to be determined by a Judge in this Court, is a good and sufficient disqualification. No man can sit in judgment in his own case. Natural reason and natural justice forbid it, and so does the common law.

No matter how slight the interest which a juror may have in the issue; if he has any, the common law will not permit him to try the cause—so with a Judge.

Says Lord Mansfield, in Hesketh vs. Braddock, 3 Burrows, p. 1856 : " The law has so watchful an eye to the pure and unbiassed administration of justice, that it will never trust the passions of mankind in the decisions of any matter of right. If, therefore, the Sheriff, a juror, or a witness be *in any sort interested* in the matter to be tried, the law considers him as under an influence which may warp his integrity, or pervert his judgment, and therefore will not trust him. The *minuteness* of the interest won't relax the objection. For, the *degrees* of influence can't be measured—no line can be drawn, but that of a total exclusion of all degrees whatsoever."

A Judge, as well as a juror, must be *immediately* inter-

ested in the very issue in question, and not remote and uncertain or *speculative*. A mere speculative possibility of such an interest is no sufficient ground for a principal challenge to a juror or Judge.

In the case last above quoted, the learned Judge says: "The case of the City of London vs. Wood was cited on both sides. Mr. Davenport relied on the words of Lord Chief Baron Ward, that the objection to the Mayor's sitting as Judge in a cause of the corporation was not so much in point of *interest* as inconsistency. But is not the *interest* a great *ingredient* in that inconsistency? And hence comes the rule 'that no man shall be a Judge in his own cause.'"

From this we may infer that if there was an apparent inconsistency, in which *interest* was not mingled, that therefore inconsistency would not, of itself, be a cause of challenge. It would then amount to a question of sensitiveness or delicacy, which would not disqualify a juror or render a Judge of the Supreme Court so incompetent as to make a Circuit Court Judge competent to try the issue.

The case of Wood vs. Stoddard, 2 Johnson, 194, was a *qui tam* action to recover usurious interest, one moiety of which, by statute, went to the use of the poor of the town where it was received. That Court would not permit inhabitants of the town to try the action. The reason is obvious: there was an immediate interest in the issue—it was not remote, speculative, uncertain, or a mere possibility.

In the case of Page vs. the Contoocook Valley Rail Road, 1 Foster's Reports, 438, the issue was awarding damages for laying out a road across private lands. The juror challenged was a stockholder in *another* Rail Road, which was not a party before the Court; but there was a contract between both roads, that the sums paid to land owners would be part of the expense of constructing and completing the roads. The Court very properly held the juror disqualified.

In this case, as in the last, there was an immediate interest—it was not a mere possibility.

The case of Sanborn vs. Fellows, 2 Foster, 481, contains a very clear and instructive exposition of the law on this subject. That was a case where a relative of the judicial officer was related to one of the parties. The *interest* of the relative was immediately in the issue. The Court very properly held him disqualified.

In Heydenfeldt vs. Towns et al., 27 Ala. Reports, p. 429, the Judge appointed commissioners to audit the claims against the estate of which he was a creditor. The Court held that as he was interested in the distribution of the estate, he was incompetent to appoint commissioners to audit. And in this case that Court say: "The general rule unquestionably is, that it is improper and irregular for a Judge to try any cause in which, under the law, he had an interest which would disqualify him as a witness." In support of which they cite Dimes vs. the Grand Junction Canal Company.—16 Eng. L. & Eq. Reports, p. 63. And, in commenting upon that case, they say it "*is entitled to the highest consideration;* being the judgment of the House of Lords, consisting of the Lord Chancellor, Brougham and Campbell, assisted by the Judges, after full discussion by eminent counsel, the case itself being one of great interest and importance."

Now, this is a limitation to the broad rule laid down by Lord Mansfield, in 3 Burrows, as to interest; for we well know there are several cases in which a witness, having an interest in the issue, may testify. For instance, where his interest is equally balanced, &c.

The Supreme Court of Arkansas, in Fowler, Adm'r, vs. Byers, Adm'r, 16 Arkansas, 196, decided that a Circuit Judge is not disqualified to preside, where he is related by affinity, within the constitutional degrees, to one of the par-

ties in a cause, who is merely a Trustee, and has no interest in the determination of the cause. Because, they say, he was but a Trustee, holding the mere legal title of a portion of the lands proceeded against, and the complainants sought no decree against him personally, nor against any thing in which he had any interest.—Underhill vs. Dennis, 9 Paige, 206.

Having laid down the above principles of law, which, we think, should govern this case, we will proceed to inquire what was the question at issue between the parties in the said case of the Trustees of the Internal Improvement Fund vs. William Bailey, and whether the Pensacola and Georgia Rail Road Company have any immediate and certain interest in the issue in that case—that is to say, whether the said Company will gain or lose in either way it may be decided; which issue was, whether the General Assembly had the power to divert any portion of said fund to other purposes than those designated in said act, to wit: for the purpose of clearing out the mouth of the river Apalachicola, *in derogation of the rights* of said William Bailey as the holder of bonds issued by said Pensacola and Georgia Rail Road Company, under the said Internal Improvement act?

The answer of the Trustees to the bill of complaint filed by said William Bailey—to enjoin them from paying out of said fund, in derogation of his rights, the amount thus appropriated for the clearing out the mouth of said river, and the argument of their counsel—assumed that the said Internal Improvement act was unconstitutional in the following particulars, to wit:

1st. So much of the said act wherein it pledged the fund to a Canal and certain Rail Roads—leaving out navigable streams—and so much as pledged the lands given to the State for Internal Improvement.

2d. Wherein it promised to pay out of said fund, agree-

ably to the provisions of said act, the *interest* from time to time, as it may become due on the bonds to be issued by the different Rail Road Companies under authority of that act, if the Rail Road Companies did not pay said interest; and that, therefore, there was no contract to pay the interest on said bonds with any one. But *all*, we think, are embraced in the question as above stated.

This leads us now to examine the provisions of the Internal Improvement act. It enacts that the Companies which shall accept the act might issue bonds to a certain extent per mile, and that these bonds of the Companies should contain a certificate on the part of the Trustees that they are issued according to the provisions of the act, and that the trust fund is pledged to pay the *interest.*—See section 3.

It will be noticed that the Trustees themselves assume no obligation in their certificate, but merely declare what the act proposes to do.

The act requires the Companies to pay, during the progress of the construction of the road, 50 per cent. of their earnings, to be applied to the interest of their bonds.—See section 11.

Before receiving their bonds from the Trustees, to whom they are delivered for the purpose of getting certificate of the pledge of the fund to pay interest, the Companies are required to pay the first six months' interest or cut off the first coupon.—See section 9.

The 12th section requires the company to pay to the Trustees of the Internal Improvement fund at least one-half of one per cent., after the completion of the road, on the bonds issued by them, every six months, for a sinking fund which is created to pay the principal of the bonds. It will be borne in mind that no other provision is made in that act for the payment of the principal, and the *fund is not pledged for this purpose.* The Trustees are authorized to purchase the

bonds as an investment of the sinking fund; but this, it is provided, shall not relieve the company from paying the interest.

For all payments made out of the trust fund on account of interest, the Trustees are entitled to receive stock from the company equal to the amount paid. The company would still be bound to pay the bonds, principal and interest.—See section 14.

The foregoing being all the provisions of the Internal Improvement act touching this question, for the purpose of testing whether the Pensacola and Georgia Rail Road Company had any interest in the issue in this case, let us ask the question, Could the company have brought a suit against the Trustees to enjoin them from diverting the fund? and, if not, why not? Turn to the act and we find the answer to be, because it had no interest. In response to such an application, any Court would very properly say to the Rail Road Company: You got all you were entitled to when the guarantee of interest was signed by the Trustees. And the Court would also say to them: As to the disposition of the fund, you have no concern—that is a matter between the bond-holder and Trustee; all you (the company) have to do is to pay up your interest, and if you do not, for want of ability, pay the whole amount, and the Trustees pay the deficiency, then you must make it good to the Trustees by delivering to them an equal amount of stock. We are at loss to conceive any ground under which the Rail Road Company could have made the application, because, as we have already stated, we cannot find that, by the provisions of the Internal Improvement act, the said company had any interest.

If, then, the said Rail Road Company could not make such an application to the Court, because there was no injury done to it, how can it be said the company had an in-

terest in the suit between the Trustees of the Internal Improvement Fund and William Bailey?

It may be asked: Suppose the certificate of the Trustees on bonds issued by the Rail Road Company, which are not sold, should be declared void, would not this affect the value of the bonds for sale, and are not the company, in consequence, interested in the question at issue in this cause?— would it not also depreciate the bonds sold, so that the company could buy them at reduced prices?

The answer to that is, the interest supposed in the question is but a *speculative* interest.

It would be difficult, we think, for any Court to say that in such a case the bonds would be affected, so far as the Rail Road is concerned, because it depends on the views of men and not on the law of the case. Some companies—as in the case of the Pensacola and Alabama Rail Road Company, and the Tocoi and St. Augustine Rail Road Company— might prefer the bonds untrammelled and not subjected to the impositions and restrictions of said Internal Improvement act; such bonds might or might not sell best in market, according to the views of men. On bonds not issued under the Internal Improvement act, the obligation of the company is the same; and if the traffic of the road gives ordinary assurance of the ability of the company to pay interest as well as ultimate principal, we may suppose moneyed men would give as much for the bonds without as with the certificate. The certificate of the Trustees will add nothing to the value of the bond, if the company could not pay. It is manifest, therefore, that the interest supposed is a speculative interest, not direct or certain, and not in the fruits of this litigation. It is upon the supposition that a Judge's or juror's interest is such that his judgment might be influenced, that the law considers him disqualified.

Does a speculative interest—which may or not exist, one

way or the other, as in this case, for it cannot be known whether the company would be most benefited if the fund were or were not enjoined upon the application of the bond-holder—enter the mind of the Judge so as to influence him?

How could he be influenced, when he neither knows, or can know, how he is to be benefited?

The interest which disqualifies is a legal interest, certain and dependent on the result of the case.

Again. It may be asked: Suppose the certificate declared good and binding, and the fund inalienable for any other purposes than those expressed in the act, would it not so establish the validity and value of the bonds that it would increase their prospects of sale, thereby facilitate the completion of the road and thus make the said Rail Road Company interested?

This question is of a similar character as the former—indeed is the converse of it—and hence the same observations as to speculative interest are applicable.

The whole question in this suit was, and is, between William Bailey, the bond-holder, and the said Trustees; because it was for the benefit of the bond-holder that the trust fund was pledged, and the contract is with them. Any decision that the Court could have rendered, declaring the certificate of the Trustees unconstitutional, would not have affected the legality of the bonds or the obligation of the company to pay them, principal and interest. The Rail Road Company had no interest in the fund, which was the question in the case.

We have, thus far, supposed the constitutionality of the Internal Improvement act as involved in the issue in this case. But it was not, in fact, so involved; and could not be brought in, notwithstanding the answer set it up and the counsel argued it. The Trustees were not the parties to make it, and could not make it; for the reason that if the

Internal Improvement act was unconstitutional, then they were not Trustees.

It must be obvious that the interest of the said Rail Road Company, in the case at bar, is speculative and uncertain. The said road having no interest in the result of this suit, or the issue presented, it follows that the said Chief Justice and said Associate Justice are not disqualified to sit in this cause, and hear and determine the matters in issue ; and, as they are not disqualified, a Circuit Court Judge would not be competent to sit.

The order for calling in Circuit Court Judges cannot, in law, be made.